UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
:
UNITED STATES OF AMERICA, :
:
v. : 17-cr-0047-DLC
:
MAHMOUD THIAM, :
:
Defendant. :
:
---------------------------------------- X

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MAHMOUD THIAM'S MOTION FOR PRETRIAL RELEASE

Paul E. Summit
Andrew T. Solomon
SULLIVAN & WORCESTER LLP
1633 Broadway, 32nd Floor
New York, New York 10019
Telephone: (212) 660-3000
Facsimile: (212) 660-3001
psummit@sandw.com
asolomon@sandw.com

*Attorneys for defendant Mahmoud Thiam*

**TABLE OF CONTENTS**

I.  PRELIMINARY STATEMENT ................................................................................1

II. RELEVANT FACTS ............................................................................................3

    A.  Mr. Thiam Has Been Acutely Aware Of The Possibility Of Arrest For Many Years, And Has Never Taken Any Evasive Action ..................................................4

    B.  The Government Misstated Key Facts At The Detention Hearing ...............6

III. ARGUMENT ......................................................................................................9

    A.  There Is No Basis Here For A Finding That Mr. Thiam Is A Flight Risk ......9

    B.  Even A Finding Of Flight Risk Would Not Support Pretrial Detention Standing Alone .................................................................................................9

        1.  Factor One: The Nature and Circumstances of the Offense Charged Support Pretrial Release ..................................................................................11

        2.  Factor Two: The Weight of Evidence Favors Mr. Thiam's Release ......12

        3.  Factor Three:  Mr. Thiam's History and Characteristics Favor Pretrial Release ...13

        4.  Factor Four:  Mr. Thiam Poses No Danger to the Community .............15

    C.  The Bail Package Proposed By Mr. Thiam Is Sufficient To "Reasonably Assure His Appearance" Under Section 3142(g) ..................................................15

CONCLUSION .......................................................................................................16

i

# **TABLE OF AUTHORITIES**

**Cases**

*Stack v. Boyle*,
  342 U.S. 1 (1951) ................................................................................................... 2

*United States v. Baig*,
  536 F. App'x 91 (2d Cir. 2013) ............................................................................. 13

*United States v. Berkun*,
  392 F. App'x 901 (2d Cir. 2010) ................................................................. 11, 12-13

*United States v. Berrios-Berrios*,
  791 F.2d 246 (2d Cir. 1986) ................................................................................ 9-10

*United States v. Bonner*,
  No. 13 Cr. 986 (LTS), 2014 U.S. Dist. LEXIS 52427 (S.D.N.Y. Apr. 14, 2014) .................. 12

*United States v. Fortna*,
  769 F.2d 243 (5th Cir. 1985) ................................................................................ 10

*United States v. Orta*,
  760 F.2d 887 (8th Cir. 1985) ................................................................................ 10

*United States v. Sabhnani*,
  493 F.3d 63 (2d Cir. 2007) ........................................................................ 2, 10, 11

*United States v. Salerno*,
  481 U.S. 739 (1987) ............................................................................................. 10

*United States v. Sun-Diamond Growers*,
  526 U.S. 398 (1999) ............................................................................................. 12

*United States v. Williams*,
  654 F. App'x 3 (2d Cir. 2016) ........................................................................ 10-11

*United States v. Zherka*,
  592 F. App'x 35 (2d Cir. 2015) ........................................................................ 9, 10

**Statutes**

18 U.S.C. § 1956 (2012) ......................................................................................... 1, 11

18 U.S.C. § 1957 (2012) ......................................................................................... 1, 11

18 U.S.C. § 3142(c)(1)(B) (2012) ........................................................................... 10, 5

18 U.S.C. § 3142(e) (2012) ..................................................................................... 2, 9

18 U.S.C. § 3142(e)(3) (2012) ........................................................................................... 11

18 U.S.C. § 3142(g) (2012) ..................................................................................... 2, 11, 15

18 U.S.C. § 3145(b) (2012) ................................................................................................ 1

Defendant Mahmoud Thiam, through his counsel, Sullivan & Worcester LLP, respectfully submits this Memorandum of Law in support of his motion for pretrial release pursuant to 18 U.S.C. § 3145(b).

## I. PRELIMINARY STATEMENT

On December 13, 2016, Mr. Thiam was arrested on a criminal Complaint charging violations of 18 U.S.C. §§ 1956 and 1957 (money laundering). The Complaint (now supplanted by a nearly identical Indictment) alleges events "from in or about 2009 up to and including at least in or about August 2011." Declaration of Paul E. Summit dated January 23, 2017 (the "Summit Decl."), Ex. 1 at ¶ 1. The Complaint and Indictment charge that Mr. Thiam, as a government Minister in Guinea in 2009 and 2010, "engaged in a scheme to accept bribes from senior representatives of a Chinese conglomerate and to launder that money into the United States and elsewhere." *Id.* at ¶ 4 and Ex. 2 at ¶ 1. Since his initial brief appearance that evening before a Magistrate Judge (at a detention hearing that lasted perhaps 15 minutes) (the "Detention Hearing"), Mr. Thiam has been held in detention at the Metropolitan Detention Center in Brooklyn.

There is no legal basis for Mr. Thiam's pretrial detention. In fact, there is *nothing* relevant that distinguishes Mr. Thiam from the myriad other white collar defendants with deep roots in New York City for whom bail conditions are routinely set.

Pretrial Services interviewed Mr. Thiam, and recommended that Mr. Thiam be released on bond with certain standard conditions. However, the Government contended repeatedly at the Detention Hearing that Mr. Thiam had lied to Pretrial Services about his assets. Based on those representations, the Magistrate Judge concluded that "it appears Mr. Thiam was not forthcoming with Pretrial Services" (Summit Decl., Ex. 3 at 12:24-25); and concluded that the Government had sustained its dual burden under the Bail Reform Act of 1984 (the "Act") that (1) Mr. Thiam

was a flight risk; and (2) that no set of conditions would reasonably assure his appearance.

The Magistrate Judge's detention order must be reversed for two reasons.

First, the Magistrate Judge explicitly relied upon the Government's assertion of "facts" demonstrating Mr. Thiam's supposed lack of candor with Pretrial Services. The Government was simply wrong about these supposed "facts."

Second, even if the Magistrate Judge had determined on a sound basis that Mr. Thiam posed some degree of flight risk (and there was no such basis), the Magistrate Judge failed to adequately consider alternatives to incarceration that would reasonably assure Mr. Thiam's appearance, as required by Second Circuit law. In fact, all of the factors to be considered under the Act, *see* 18 U.S.C. § 3142(g), regarding the reasonable assurance of a defendant's appearance are overwhelmingly in favor of Mr. Thiam's release.

Finally, the Magistrate Judge appeared to stray from governing principles. The right to bail is fundamental to our legal system and contained within the Bill of Rights. Chief Justice Vinson explained:

> From the passage of the Judiciary Act of 1789…to the present…federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction…Unless this right to bail before trial is preserved, the presumption of innocence secured only after centuries of struggle, would lose its meaning.

*Stack v. Boyle*, 342 U.S. 1, 4 (1951). Consistent with these basic principles, the Act *presumes* release unless the Government meets its "dual burden" in proving that Mr. Thiam is a flight risk *and* that no combination of conditions would reasonably assure his appearance at trial. *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); s*ee also* 18 U.S.C. § 3142(e).

2

## II.     RELEVANT FACTS

Mr. Thiam was born in Guinea in 1966.  In 1971, when he was 5, his father and many of his family members were arrested, under the dictatorial rule of the first President of Guinea, Ahmed Sékou Touré.  Mr. Thiam's father was tortured and then murdered.  For safety, Mr. Thiam's mother arranged for him to be smuggled out of the country and taken to live with his uncle in Ethiopia.

The Touré government continued to pursue the family, with an attempted kidnapping in Ethiopia.  Mr. Thiam then spent his childhood as a peripatetic and hounded refugee, living variously in France, Togo, Zambia and Belgium.  He had no national passport and traveled on U.N. "laissez passer" documents.

Thirty years ago, in 1987, as a 20-year old, Mr. Thiam came gratefully to the United States.  He lived in Washington D.C., learning English and attending Montgomery Community College, and then transferred to Cornell University in New York (class of '91).  Since 1987, with the exception of two years, 2009 to 2010, Mr. Thiam has lived continuously in the United States.  He became a naturalized U.S. citizen in 2002.

In 1994, he began a successful banking career at Merrill Lynch.  His team there advised governments and companies on mining, oil and gas in Africa.  (In 2004, Mr. Thiam was recruited with his team to UBS.)

Also in 1994, Mr. Thiam married his wife Fatim.  Mr. Thiam, Fatim, and their three daughters Zeinab (18), Maryam (16) and Iman (13) reside with Mr. Thiam in New York City on the Upper East Side, 170 East End Avenue, #16B.  Mr. Thiam's three daughters were all born in the United States and have spent their entire lives in New York City.  The daughters attend Dalton and Horace Mann.  (Fatim was born in Senegal but has lived in the United States since 1989, and is also a naturalized U.S. citizen as of 2002).

3

Over his years in banking, Mr. Thiam established professional relationships within Guinea, particularly in the commodities and banking sectors.

Late in 2008, while working in New York City at UBS, Mr. Thiam was invited by the new Prime Minister, Kabine Komara, to be Minister of Mines. He accepted, and served for two years, from early 2009 until the end of 2010. His wife Fatim and his young daughters Zeinab, Maryam and Iman continued living in New York City, while Mr. Thiam lived in Guinea. In late 2010, the opposition politician Alpha Conde came to power, and Mr. Thiam returned to New York City and private life. He has lived here ever since, and has been a mining and business consultant. He has maintained a business office in New York City at 641 Lexington Ave., Suite 1309, and has typically had 2 to 5 employees at a time.

### A. Mr. Thiam Has Been Acutely Aware Of The Possibility Of Arrest For Many Years, And Has Never Taken *Any* Evasive Action

Mr. Thiam's brief period in Guinea was a turbulent time in that nation, and rumors and allegations against many individuals involved privately or publicly in mining in Guinea have circulated ever since. President Conde is a determined and ruthless adversary of Mr. Thiam's. Mr. Thiam has known of multiple government investigations, including that of the United States, for many years. At least since 2012, there have been widely publicized criminal investigations (in Guinea and elsewhere) into mining rights in Guinea. In October 2012, Mr. Thiam learned of a letter issued by an official Guinean government committee that suggested that Mr. Thiam had acted corruptly while he was the Minister of Mines. (Mr. Thiam rebutted these allegations in November 2012). In April 2013, Frederic Cilins was arrested in Florida for obstructing an ongoing federal grand jury investigation in Manhattan relating to bribes to officials of Guinea for the purpose of obtaining valuable mining concessions in Guinea. *See United States v. Cilins*, 13-cr-315-WHP (S.D.N.Y.). In July 2013, a lengthy story appeared in The New Yorker exploring

4

the allegations of corruption, describing the ongoing United States grand jury investigation, and citing allegations by the then Government of Guinea that Mr. Thiam had taken bribes.

In April 2014, Thiam (along with other co-defendants) was sued in federal court in Manhattan by the giant energy company Rio Tinto, falsely accusing him of taking $200 million in bribes while he was Minister of Mines (Civil Action No. 14 Civ. 3042).  In March 2015, a Wall Street Journal story alleged that at least six U.S. indictments based on alleged corruption in the granting of Guinea mining concessions could be forthcoming.  Summit Decl., Ex. 4.  As if all this were not enough, on multiple occasions, Mr. Thiam's bank accounts in the United States have been shut down repeatedly without explanation by the banks (Summit Decl., Ex. 5), and Mr. Thiam has been repeatedly stopped during his return to the United States from international travel for extensive "secondary questioning."  And finally:  Mr. Thiam has heard from friends and colleagues over the last several years that U.S. agents have traveled abroad (Germany, Morocco, Guinea, Switzerland) to question witnesses about him .

Thus, Mr. Thiam has been acutely aware of the possibility of arrest and prosecution for years.  However, during all that time, he has traveled extensively abroad for business, but always returning to the United States, his sole place of residence.  He has traveled almost exclusively on his U.S. passport, in his own name, with absolutely no hint of any evasive action or preparation for flight.  If Mr. Thiam was going to flee, he would have left months if not years ago.  The possibility of an arrest has been known to Mr. Thiam for a long time.[1]

---

[1] Mr. Thiam had two U.S. passports (now in the Government's possession).  One had run out of available pages and was thus double hole punched, effectively cancelling it.  Mr. Thiam kept it because it had a still-valid Indian visa.  Mr. Thiam also had a second, still effective U.S. passport.  He also had Guinean and French passports, which also are now in the Government's possession.  In recent years, the only time he used those (as opposed to his U.S. passport) was on those occasions when he was entering a country that would require a visa if presented with a U.S. passport, but would not require a visa if presented with a Guinean or French passport.

5

### B. The Government Misstated Key Facts At The Detention Hearing

Following his arrest and a day of questioning by agents and processing, Mr. Thiam was interviewed by Pretrial Services. Mr. Thiam disclosed business revenues in excess of a million dollars a year. He also disclosed extensive debts, and virtually no assets. He responded to the specific questions posed.

Pretrial Services recommended Mr. Thiam's release on a bond, with additional conditions. Nevertheless, after a brief hearing, and mistaken representations by the Government indicating that Mr. Thiam had lied to Pretrial Services, the Magistrate Judge found that "[g]iven what [Mr. Thiam] has told Pretrial Services and how that contrasts with information that the Government has with respect to *existing* assets and *existing* income, I'm not prepared to release him…."[2] Summit Decl., Ex. 3 at 13:4-7. He went on: "on the present record the Government has sustained its burden of demonstrating that the defendant presents a risk of flight such that there are no conditions that would reasonably assure his return to court." *Id.* at 12:19-22.

Much of the sparse information presented by the Government at the Detention Hearing, however, was either wrong or so woefully outdated as to have no relevance to present events. The Magistrate Judge's decision ordering Mr. Thiam's pretrial detention was based on the Government's misguided proffer.

First: when describing assets to Pretrial Services, Mr. Thiam reported that he had no open U.S. bank accounts (because successive bank accounts have been closed since about 2011 without explanation by the banking institutions, presumably in response to direction from the Government). At the Detention Hearing, the Government tried to "put the lie" to Mr. Thiam's statement about U.S. bank accounts. The AUSA stated,

---

[2] All emphasis is added, unless otherwise indicated.

6

> I learned from the agent that the defendant controls bank accounts, at least one bank account, in Capital One Bank also not reported in the Pretrial Services report and has received hundreds of thousands of dollars in that bank account within the last year or so from an entity called Extractor [sic] Mining, also not reported on the Pretrial Services report. *Id.* at 6:18-23.

There were two important misstatements here. Mr. Thiam does *not* have a bank account at Capital One Bank; his bank account there was closed many months ago. *See* Summit Decl., Ex. 5. Also, the receipt of hundreds of thousands of dollars into that account when that account did exist is precisely *consistent* with Mr. Thiam's report to Pretrial Services that he earned revenues annually in excess of a million dollars.

There is more. The Government further contended, in a discussion of Mr. Thiam's supposed failure to report assets to Pretrial Services: "[N]one of these assets [were reported to Pretrial]…The bank accounts that we're aware of, United States based bank accounts defendants controls [sic]…" Summit Decl., Ex. 3 at 10:11-14. Thus the Government was representing that there *presently* exist *multiple* U.S. bank accounts "controlled" by Mr. Thiam that he did not disclose to Pretrial Services. Again: we believe that the Government has no proof of this, because it is simply wrong.

And then, citing information from 2010, the Government claimed that Mr. Thiam "*has* significant financial resources outside the United States which he hasn't said a word of to Pretrial Services." *Id.* at 5:13-15. Specifically, the Government referenced accounts in Hong Kong, Luxembourg, and Switzerland. That "evidence" was woefully outdated. Mr. Thiam's Hong Kong bank account is long closed. Nor does Mr. Thiam have bank accounts in Luxembourg or Switzerland.[3]

---

[3] The Government based its claims about Mr. Thiam having bank accounts in Luxembourg and Switzerland on a March 25, 2010 interview of Mr. Thiam by some unnamed J.P. Morgan employee.

7

The Government also said that, in 2013, the defendant had represented to a Customs and Border Protection agent that he had an account in Bahrain. That was at least factually accurate; Mr. Thiam once did have an account in Bahrain,[4] but he believes that he last had any money in that account years ago, and he presumes that the bank closed the account back then.[5]

Finally, at the hearing, the Government noted that "the defendant's 2010 tax returns list no fewer than about 12 different companies, Sunbathe [presumably "some"] in Dubai in the United Arab Emirates, three in particular, and several others based out of the Virgin Islands…." *Id.* at 6:2-6. The implication, again, is that Mr. Thiam was concealing valuable assets from Pretrial Services that would aid him in flight.[6] In reality, Mr. Thiam regards those companies (and certain related joint ventures) as utterly valueless: the products of an effort he initiated back in 2010 that (for a time) seemed promising and briefly generated consulting income, but that ultimately came to naught. He has received no funds from any of these ventures for perhaps three years.[7]

Finally, government errors aside, its proffer is of no moment. The account information was years old and stale. If the point was that Thiam had access to assets abroad that could

---

[4] At Al Salam Bank-Bahrain.

[5] As the Government is aware, Mr. Thiam does have two accounts at a bank in Dubai (Noor Bank) with negligible sums.

[6] On the day of Mr. Thiam's arrest, the Government also executed a search warrant and seized his financial and business records. Thus Mr. Thiam suffers under a double handicap in preparing this application: his records are in the Government's possession, and he is imprisoned in any event without access to many sources of information.

[7] The Government now also contends that Thiam should have listed the Dutchess County property described in the Indictment (*see* Summit Decl., Ex. 2 at ¶ 3) as an asset to Pretrial Services. But Mr. Thiam is not on the title to the property. Summit Decl., Ex. 6. There is no way that Mr. Thiam could use the Dutchess County property as a source of funds for flight, through sale or hypothecation. The Government asserts that Thiam somehow lied by omission to Pretrial Services because (in its view) he has "beneficial ownership" of the property. But first: Pretrial Services did not inquire about "beneficially owned" assets. Second: "beneficial ownership" is a complex question often involving fact specific and subtle legal issues. Third: even if Mr. Thiam could conceivably extract value from the Dutchess County property as a "beneficial owner" (and he believes he could not), he certainly could not do so within a time frame that would be meaningful for purposes of establishing collateral.

sustain him away from the United States, at the very minimum, the government's burden must require identifying at least one foreign asset that is both substantial and current. In both respects, the government utterly failed.

### III. ARGUMENT

#### A. There Is No Basis Here For A Finding That Mr. Thiam Is A Flight Risk

As noted, the Government has a dual burden: to prove that Mr. Thiam is a flight risk; and then, if he is, to prove that no set of conditions will reasonably assure his appearance.

As to the Government's first burden: there is not a scintilla of evidence that Mr. Thiam is a flight risk. Indeed, all the facts are powerfully to the contrary. Knowing for years of the possibility of arrest, he did not flee. There is no indication at all of evasive action or preparation for flight. He is determined to stay and fight for vindication. The United States is the only real home he has ever known. He has had a distinguished career here, and his family ties here are as profound as anyone's.

#### B. Even A Finding of Flight Risk Would Not Support Pretrial Detention Standing Alone

Even if there were evidence that Mr. Thiam is a flight risk (and there is not), that alone would not justify pretrial detention. The Act is clear that a finding of "flight risk" just begins the analysis. The statute unequivocally requires that, even if a court does make a "flight risk determination," the Court must still consider whether there are conditions of pretrial release that will nevertheless reasonably assure the defendant's appearance. 18 U.S.C. § 3142(e); *see also United States v Zherka*, 592 F App'x 35, 35-36 (2d Cir. 2015).

The Second Circuit has been particularly vigilant in insisting on full compliance with the statutory scheme of the Act, *i.e.*, finding risk of flight *and* that no conditions can reasonably assure appearance. In *United States v. Berrios-Berrios*, 791 F.2d 246, 251 (2d Cir. 1986), the

Second Circuit reversed the district court's pretrial detention order because of its "failure to explain on the record the extent to which it considered any alternatives to incarceration, and if so, on what basis they were rejected." *Id.* As the court explained, "consideration of such alternatives is no less important because the district court found that Berrios poses a risk of flight; *many courts have set bail for defendants despite their propensity to flee.*" *Id.*

Moreover, "[t]he standard [under the Act] is *reasonably assure* appearance, not 'guarantee' appearance…." *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985). If the Government needed to show merely that release conditions could "guarantee" a defendant's appearance, the "burden on the government in most cases to show a defendant's flight propensity would be lessened considerably." *United States v. Orta*, 760 F.2d 887, 892 (8th Cir. 1985).

Thus, to the extent conditions are appropriate, the Court must take care to select "the least restrictive…condition, or combination of conditions" that will "reasonably assure appearance." 18 U.S.C. 3142(c)(1)(B). "Under this statutory scheme, it is only a limited group of offenders who should be denied bail pending trial." *United States v Zherka*, 592 F. App'x 35, 36 (2d Cir. 2015) citing *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2010) (internal citations omitted). As the Supreme Court has admonished, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

In determining whether any conditions of release would "reasonably assure" a defendant's appearance, Section 3142(g) of the Act directs courts to consider four factors:

1. "the nature and circumstances of the offense charged, including whether the offense is a crime of violence";

2. "the weight of the evidence against the person";

    3.    the "history and characteristics of the person," which includes "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings"; and

    4.    the "nature and seriousness of the danger to any person or the community that would be posed by the person's release."

*United States v Williams*, 654 F App'x 3, 3-4 (2d Cir. 2016) (citing 18 U.S.C. § 3142(g)).

It appears that the Magistrate Judge did not apply these four factors to determine whether there were conditions that would reasonably assure Mr. Thiam's appearance. They overwhelmingly support release.

    1.    Factor One: The Nature and Circumstances of the Offense Charged Support Pretrial Release

Mr. Thiam was indicted for violations of 18 U.S.C. §§ 1956 and 1957 (money laundering). "[B]ecause the crime does not involve violence or terrorism so as to trigger a presumption in favor of detention, *see* 18 U.S.C. § 3142(e)(3), this factor weighs in favor of identifying some circumstances for [Thiam's] release." *United States v Berkun*, 392 F App'x 901, 903 (2d Cir 2010).

Moreover the alleged crime is a single episode from many years ago, not a manifestation of an ongoing enterprise. There is no allegation of wrongdoing since 2011. *Sabhnani*, 493 F.3d at 68. This is the first time Mr. Thiam has ever been arrested.

Similarly situated defendants have been afforded release subject to conditions. For example, many defendants indicted under the Foreign Corrupt Practices Act have been released pretrial. *United States v. Benito Chinea*, No. 14-cr-240-DLC (S.D.N.Y) and *United States v. Ernesto Lujan*, No. 13-cr-671-DLC (S.D.N.Y.) involved bribes paid to officials of Venezuela's state-owned bank in exchange for bond trading work. Chinea and Lujan were granted bail and released pending trial.

11

Indeed, defendants accused of far more elaborate (and financially rewarding) criminal schemes have been released on bond. *See e.g., United States v. Bernard Ebbers*, No. 02-cr-1144-BSJ (S.D.N.Y.) (defendant charged with conspiracy and securities fraud in connection with collapse of WorldCom and released with conditions prior to trial).  Even Bernie Madoff received bail and he faced a virtual certainty of a life sentence with no possibility of parole.

2. Factor Two: The Weight of Evidence Favors Mr. Thiam's Release

Mr. Thiam is of course entitled to the presumption of innocence. *United States v Bonner*, 2014 US Dist. LEXIS 52427, at *3 (S.D.N.Y. Apr. 14, 2014) (defendant "protected by the presumption of innocence of the criminal charges").  And the Government has any number of daunting challenges here in proving its allegations.  The charges involve events from many years ago.  It will have to prove up Guinean law, because the Indictment hinges on a violation of that turbulent country's law.  It will have to rely upon testimony from officials of the present Guinean government of Alpha Conde, which has a history of bitter and vitriolic hostility to Mr. Thiam.[8] It will need witnesses from the People's Republic of China.  And finally, it is by no means clear from the Indictment that the Government can prove (or even has a theory of) a *quid pro quo* here, which is a required element of bribery.  *United States v. Sun-Diamond Growers,* 526 U.S. 398, 404 (1999) ("bribery requires a quid pro quo, which includes an intent 'to influence' an official act or 'to be influenced' in an official act").

And the Government lacks the "hard proof" here that has characterized other cases in which the Government has sought pretrial detention.  *Compare United States v Berkun*, 392 F. App'x 901, 903 (2d Cir 2010) ("Recorded telephone conversations and physical evidence

---

[8] The Conde government has a disturbing lineage back to the brutal regime of Prime Minister Touré.  There are many overlapping ethnic, family and other human ties; and Prime Minister Conde has endorsed that prior regime.  Meanwhile Human Rights Watch has condemned "arbitrary and excessive use of lethal force" by the Conde security forces; and the "torture" of detainees.  Summit Decl., Ex. 7 at 2.

strongly inculpate [defendant] in the alleged crime"); and *United States v Baig*, 536 F. App'x 91, 93 (2d Cir. 2013) (weight of evidence sufficient where Government proffered that defendant made statement to law enforcement after receiving Miranda warnings in which he admitted using stolen identities to employ illegal aliens).

        3.      Factor Three:  Mr. Thiam's History and Characteristics Favor Pretrial Release

We will not reiterate all of Mr. Thiam's profound ties to New York City and the United States.  This is the only home he has known since he was 20 years old, with the brief exception of his two years in Guinea.  He is a U.S. citizen married to a U.S. citizen, with three young daughters to care for.

We also will not reiterate all the extensive evidence already cited that Mr. Thiam was acutely aware of ongoing Government investigations, and did not flee.  He has had at least 4 full years living under the shadow of a full fledged investigation.  Bank account after bank account has been shut down.  However, during all those years, he traveled internationally:  lawfully, under his own name, for business, and always returned to his home and family.

The Government seems to fear that Mr. Thiam has hidden assets to fund flight.  First, of course, there is no indication he intends to flee; the Government can point to no indications of preparation for flight, even though the ominous signs of possible arrest have surrounded Mr. Thiam for years.  Moreover, the reality of Mr. Thiam's financial situation is that he is massively in debt. Mr. Thiam disclosed business revenues in excess of a million dollars a year, but the revenue that Mr. Thiam has generated has gone to business staff salaries; business rent; and many other business expenses, as well as large personal expenses.  He and his family have huge rent (in default) and tuition expenses (also in default).  *See* Summit Decl., Exs. 8 and 9.  Mr. Thiam owes millions to the IRS and the New York State tax authorities (almost $9 million in

total).  Summit Decl., Exs. 10 and 11.  He has survived to this point through a combination of business deals, consulting income, and loans from friends and family and colleagues, but he owes huge amounts.

At the brief hearing, the Government presented a picture of a defendant who had lied to Pretrial Services in an attempt to conceal his hidden wealth.  The examples they cited of these supposed lies were wrong.  Indeed, when Mr. Thiam's financial picture is looked at clearly, it is plain that he is massively indebted and insolvent.

Along with his U.S. citizenship, Mr. Thiam is a citizen of Guinea and of France.

As to Guinea:  Mr. Thiam is a citizen based on his birth there, and his Mother and two sisters live there.  His citizenship is irrelevant to risk of flight.  The current President and his government are ruthless and determined adversaries of Mr. Thiam's.  Mr. Thiam has not set foot in Guinea since his departure in late 2010, and he believes he would be arrested (or much worse) the moment he set foot there.

As to France:  Mr. Thiam is a citizen of France by virtue of his marriage to his wife, Fatim, but he has not lived there since 1983, when he spent a year there in boarding school as a seventeen year old.  He has no close family ties or residence there.

In *United States v. Edgar Paltzer*, a U.S. defendant who was a *resident* of Switzerland was extradited in a case alleging massive concealment of assets in Switzerland to avoid U.S. tax law.  The defendant was granted pretrial release based on a $2 million personal appearance bond. 13-cr-282-VM (S.D.N.Y.).  And courts have granted bail to *foreign* defendants.  *See e.g., United States v. David Bermingham, et al.*, 02-cr-597 (S.D. Tex.) (British banker granted bail in "Enron-like" scheme based on personal appearance bond of $1 million).

14

    4.  Factor Four:  Mr. Thiam Poses No Danger to the Community

Mr. Thiam has been charged with a non-violent crime.  He has no prior criminal history; he has never even been arrested before and poses no danger to any person or the community.

All four factors lead powerfully toward the conclusion that Mr. Thiam must be released.

  C.  <u>The Bail Package Proposed By Mr. Thiam Is Sufficient To "Reasonably Assure His Appearance" Under Section 3142(g)</u>

There is no "one-size fits all" approach to bail.  Here, there are several reasonable conditions that the Court could impose upon Mr. Thiam's release and that would satisfy the statutory mandate.  They are the conditions that Pretrial Services recommended.  These conditions include:

    1.  Mr. Thiam could provide a personal appearance bond in a reasonable amount, to be cosigned by financially responsible individuals;

    2.  Mr. Thiam will reside prior to trial in his New York City apartment;

    3.  Mr. Thiam will be subject to Pretrial Services supervision as directed;

    4.  The Government has already seized Mr. Thiam's passports; he will make no new passport applications;

    5.  Mr. Thiam's travel will be restricted to the Southern and Eastern Districts of New York; and

    6.  Mr. Thiam will maintain lawful employment.

Mr. Thiam will agree to any combination of the above terms and/or monitoring as required by the Court.  The above conditions are sufficient to satisfy the statutory mandate that the judicial officer take care to selection "the *least restrictive*…condition, or combination of conditions" that will reasonably assure appearance." 18 U.S.C. § 3142(c)(1)(B).

## CONCLUSION

For the foregoing reasons, Defendant Mahmoud Thiam respectfully requests that the Court GRANT his motion for pretrial release.

Dated: New York, New York  
January 23, 2017

Respectfully submitted,

By: /s/Paul E. Summit  
    Paul E. Summit  
    Andrew T. Solomon  
SULLIVAN & WORCESTER LLP  
1633 Broadway, 32nd Floor  
New York, New York 10019  
Telephone: (212) 660-3000  
Facsimile: (212) 660-3001  
psummit@sandw.com  
asolomon@sandw.com

*Attorneys for defendant Mahmoud Thiam*